IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

GENERAL ACCESS SOLUTIONS, LTD.,(  CAUSE NO. 2:22-CV-394-JRG
                                 )
            Plaintiff,           (
                                 )
vs.                              (
                                 )
CELLCO PARTNERSHIP, d/b/a        (
VERIZON WIRELESS, et al.,        )  MARSHALL, TEXAS
                                 (  JUNE 28, 2024
            Defendants.          )  8:00 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:      BARTLIT BECK, LLP - DENVER
                        1801 WEWATTA ST., SUITE 1200
                        DENVER, COLORADO  80202
                        (303) 592-3100
                        BY: MR. GLEN SUMMERS
                            MR. GIOVANNI SANCHEZ
                            MR. NOSSON KNOBLOCH
                            MR. TAYLOR KELSON

                        WARD, SMITH & HILL, PLLC
                        1507 BILL OWENS PARKWAY
                        LONGVIEW, TEXAS  75604
                        (903) 757-6400
                        BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:     GIBSON DUNN & CRUTCHER, LLP -
                        NYC
                        200 PARK AVE., 48TH FLOOR
                        NEW YORK, NEW YORK  10166-0193
                        (212) 351-2338
                        BY:  MS. KATHERINE DOMINGUEZ
                             MR. BRIAN ROSENTHAL
                             MR. JOSH KREVITT
                             MR. SUNG BIN LEE

FOR THE INTERVENOR:     BAKER BOTTS, LLP - DALLAS
                        2001 ROSS AVENUE, SUITE 900
                        DALLAS, TEXAS  75201-2980
                        (214) 953-6500
                        BY:  MR. DOUG KUBEHL

oFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
                        (903) 923-8546

THE COURT:  Be seated, please.

Counsel, before we proceed with the formal jury--excuse me--formal charge conference on the record, are you prepared at this time to read into the record the items from yesterday's portion of the trial from the list of pre-admitted exhibits?  If you are, I'd like to get that done so we don't inadvertently miss it.

MR. HUGHES:  Thank you, Your Honor.  Good morning.  John Hughes for General Access.

We move in PX 99, PX 102, JX 8, and JX 44 -- sorry, JX 48.

THE COURT:  All right.  Any objection from Defendants?

MR. DACUS:  No objection, Your Honor.

THE COURT:  Do Defendants have a similar rendition to offer?

MR. DACUS:  Regrettably, Your Honor, the individual who's supposed to do that is not here, and we are trying to get them here.  If we can ask the Court's indulgence to read that in once they arrive.

THE COURT:  Do you expect them here in the next few seconds or are they five or ten minutes away?

MR. DACUS:  I do not know the answer to that, Your Honor.  I do know we are actively trying to determine that.

THE COURT:  All right.  Well, when they get here,

have them take a seat.  We will go ahead with the formal charge conference.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  And then after that's complete, I will hear from the Defendants on this pre-admitted exhibit issue.

MR. DACUS:  Thank you very much.

THE COURT:  All right.  At the close of the evidence yesterday, the Court heard from the parties, pursuant to any matters either party wished to move for relief under Rule 50(a), having heard and ruled on those matters, the Court then conducted an informal charge conference in chambers with multiple counsel present for all the parties where there was an open and fulsome discussion regarding the most current version of the proposed jury charge and verdict form.

The Court received valuable input and discussion with the parties through their counsel.  The Court took that input into account and over the evening considered and redrafted the final jury instructions and verdict form to be in a form the Court believes is appropriate and proper for submission in this case to this jury.

Earlier this morning, I furnished a copy of the same to both sides with an opportunity to review and consider it.  I will now conduct a formal charge conference on the record so that either party may lodge any objections they feel are necessary with regard to the existing version of the final

jury instructions and verdict form.

As those of you that have practiced before me may know, my usual approach in this matter is to ask for a single spokesman from either side, spokesperson from either side, to go to the podium, and then I intend to begin with the final jury instructions and review that document page by page.

And at any point along the way when we reach a page where you believe something has been included that should not be or something has been omitted that should be included, you can lodge such objections as you think the interests of your client require. And by doing it on a page-by-page basis, the Court feels that the likelihood of overlooking anything is greatly reduced. I'll follow the same approach with the verdict form thereafter.

So whoever is going to speak for Plaintiff and whoever is going to speak for Defendants, please go to the podium and we will begin the process.

Let me first ask counsel at the podium to identify themselves for the record.

MR. KELSON:  Taylor Kelson for the Plaintiff, Your Honor.

MR. CHUNG:  Good morning, Your Honor.  Jaysen Chung for Defendants.

THE COURT:  All right.  Thank you, counsel.

Let's begin with the final jury instructions.  We'll

begin with the cover sheet or page 1.  Are there any objections here from either Plaintiff or Defendants?

MR. KELSON:  No, Your Honor.

MR. CHUNG:  No objections.

THE COURT:  Turning then to page 2, are there any objections here?

MR. KELSON:  No objections, Your Honor.

MR. CHUNG:  No objections for Defendants.

THE COURT:  All right.  We'll then turn to page 3. Are there any objections here from either party?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Next is page 4.  Are there any objections here, counsel?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections for Defendants.

THE COURT:  All right.  Then we'll turn to page 5 next.  Any objections here from either party?

MR. KELSON:  No objections for the Plaintiff, Your Honor.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Next is page 6.  Are there objections here?

MR. KELSON:  No objections for the Plaintiff, Your Honor.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning then to page 7 of the final jury instructions, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning next to page 8, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  And no objections for Defendants.

THE COURT:  Next then is page 9 of the final jury instructions.  Are there objections here from either party?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Next is page 10.  Are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning then next to page 11, are there any objections here, counsel?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Next then is page 12.  Are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning then to page 13, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning next to page 14, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Next then we'll turn to page 15.  Are there any objections here, counsel?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning then to page 16, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  No objections for Defendants.

THE COURT:  Turning then to page 17 of the final jury instructions, are there any objections here?

MR. KELSON:  No objections for the Plaintiff.

MR. CHUNG:  Defendants object to the language at the bottom of page 17, the language that says, or whether a commercially viable product has been developed.

We believe this improperly sets a bright line rule for

what should not be included in the enablement analysis, and to make enablement requirement the jury should be left to decide what embodiments fall within the scope of the claim and therefore what must be enabled.

THE COURT:  All right.  That objection's overruled.  Anything further on page 17?

MR. CHUNG:  Nothing further from Defendants, Your Honor.

THE COURT:  We'll turn then to page 18.  Are there any objections here?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Turning next to page 19, are there any objections here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Turning then to page 20, are there any objections here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Turning then to page 21, are there any objections here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

1234

THE COURT:  Counsel, I'll note that pages 20 and 21 contain all 15 of the *Georgia-Pacific* factors.  I gather by your lack of objections that neither party objects to the Court charging the jury on all 15 factors in this case.  Is that correct?

MR. KELSON:  That's correct, Your Honor.

MR. CHUNG:  That's correct from Defendants, Your Honor.

THE COURT:  All right.  Then we'll turn next to page 22.  Are there any objections here from either party?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections from Defendants.

THE COURT:  All right.  Next is page 23.  Any objections here?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Turning next to page 24, any objections here?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections from Defendants.

THE COURT:  All right.  Turning to page 25, any objections here?

MR. KELSON:  No objections from the Plaintiff, Your Honor.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Counsel, is 25 your last page or do you have a page 26?

MR. KELSON:  I have a page 26, Your Honor.

THE COURT:  All right.  I just wanted to make sure that the version you had matched with mine exactly.

Let's look then at page 26.  Are there any objections here from either party?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  All right.  That should complete the final jury instructions.  We'll next turn to the verdict form. We'll follow the same approach beginning with the cover page or page 1 of the verdict form.  Is there objection here from either party?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  All right.  Turning then to page 2 of the verdict form where various definitions are found, is there any objection here from either party?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  And no objections from Defendants.

THE COURT:  Turning to page 3 where instructions are

1236

found, is there any objection here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Next is page 4 of the verdict form where Question 1 is found.  Is there any objection here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  No objections from Defendants.

THE COURT:  Next is page 5 where Question 2 is found.  Are there any objections here?

MR. KELSON:  No objections from the Plaintiff.

MR. CHUNG:  Defendants object for two reasons: First, that the written description and enablement requirements are separate and distinct requirements and, therefore, we believe they should be set forth in two separate questions in the verdict form.

The second basis is that the invalidity question we would submit, Your Honor, should be consistent with the infringement question, Question No. 1 on the verdict form, which is set out patent by patent rather than claim by claim.

We understand that Question 2 doesn't set it out by claim by claim, but it does refer to the claims of the patents.

THE COURT:  All right.  Those objections are overruled.  Anything further on page 5?

MR. CHUNG:  Nothing further from Defendants, Your Honor.

THE COURT: Then we'll turn to page 6 of the verdict form where Question 3A is located. Any objection here from either party?

MR. KELSON: No objection from the Plaintiff.

MR. CHUNG: No objections from Defendants.

THE COURT: Next is page 7 where Question 3B is found. Any objection here, counsel?

MR. KELSON: No objection from the Plaintiff.

MR. CHUNG: No objections from Defendants.

THE COURT: And last is page 8, the final page of the verdict form. Are there any objections here?

MR. KELSON: No objections from the Plaintiff.

MR. CHUNG: No objections from Defendants, Your Honor.

THE COURT: All right. Thank you, counsel. That completes the formal charge conference.

The Court will recess, during which time it will generate eight copies of the final jury instructions and one clean copy of the verdict form to be delivered to the jury during their deliberations.

Before I recess, let me ask Defendants if they are now prepared to read into the record any items from the list of pre-admitted exhibits used during yesterday's portion of the trial.

MR. DACUS: We are, Your Honor. Thank you.

1238

THE COURT:  Let's proceed to do that at this time.

MR. TOLLE:  Thank you, Your Honor.  Griffin Tolle on behalf of Defendants.

We'd like to read into Joint Exhibit 40, Defendants' Exhibit 12, Defendants' Exhibit 21, and Defendants' Exhibit 23.

THE COURT:  All right.  Any objection to that rendition from the Plaintiff?

MR. HUGHES:  No, Your Honor.

THE COURT:  All right, counsel.  With that, Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

All right, counsel.  I'm about to bring in the jury and present my final jury instructions to them followed by your closing arguments.  Let me ask before we begin, however, who does Plaintiff intend to present Plaintiff's closing arguments?

MR. SUMMERS:  Your Honor, Mr. Knobloch will do our closing argument, and then Ms. Fair will do our rebuttal.

THE COURT:  All right.  Mr. Knobloch will go first and Ms. Fair will go second.

All right.  What about Defendants?

MR. DACUS:  Your Honor, Mr. Krevitt and I will split it, but Mr. Krevitt has not made it out of the gentleman's

room yet.

THE COURT:  He's on the premises?

MR. DACUS:  Yes, sir.

THE COURT:  Okay.  And Mr. Krevitt will go first and then hand off to you, Mr. Dacus.

MR. DACUS:  Yes, Your Honor --

THE COURT:  Okay.

MR. DACUS:  -- with the Court's permission.  And we are now fully assembled and ready to go.

THE COURT:  All right.  Let me say to those of you present, particularly those of you in the gallery, that the Court considers its final instructions to the jury and counsel's closing arguments as the most serious part of an inherently serious process.

Consequently, I don't want any disruptions or distractions to take place during my final instructions to the jury and counsels' closing arguments.  If you need to get up and leave or you need to get something brought in to you or you need to pass something from one person to another, do it now.

Make sure if you have a device on you that it is silenced or off because if it distracts this jury during this process, I will consider that a sanctionable event.

I don't know how to be any clearer.  I want everybody to be as respectful and as focused on what's about to take place

as possible.

All right.  Is there anything from the Plaintiff before I bring in the jury and present the Court's final instructions?

MR. SUMMERS:  Nothing from the Plaintiff, Your Honor.

THE COURT:  Is there anything from the Defendants?

MR. KREVITT:  No, Your Honor.

THE COURT:  Let's bring in the jury, please, Mr. Barnett.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going instruct you on the law that you must apply.

I want you to be clear, each of you are going to have your own individual printed copy of these final jury instructions that I'm about to give you orally.  I do that so that you'll be able to refer to them during the deliberations and I do that so that you will have the opportunity to pay direct and close attention to me now rather than feel compelled to take notes.  So if I can have your undivided attention, I'll proceed to give you these final jury instructions.

It's your duty to follow the law as I give it to you.  On

the other hand and as I've said, you, the jury, are the sole judges of the facts in this case.

Do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as an indication that the Court has any opinion about the facts in this case.

Now, you are about to hear closing arguments from the attorneys for both sides.  Statements and arguments of the attorneys are not evidence, and they are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you, and you'll take this verdict form with you to the jury room when you retire. And when you have reached a unanimous agreement as to the questions in the verdict form, you will have your foreperson fill in the blanks in that form reflecting your unanimous decisions, have your foreperson date the document and sign it, and then advise the Court security officer that you have reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide, ladies and gentlemen, who you think should win this case and then answer the questions to reach that result.  Again, your answers and your verdict must be unanimous.

Now, in determining whether any fact has been proven in

this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all of the exhibits that have been received and admitted into evidence, regardless of who may have introduced them.

You, the jury, are the sole judges of the credibility of each and all of the witnesses, and you are the sole judges of the amount of weight and effect to give to all of the evidence. In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You alone are to determine the questions of credibility, believability, and truthfulness of the witnesses.

In weighing the testimony of the witnesses, ladies and gentlemen, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case or its outcome, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence? Has he or she made statements at other times and other places contrary to what they said on the witness stand? You must give the testimony of each witness the amount of weight and credibility that you believe it deserves.

You must also keep in mind, ladies and gentlemen, that a

simple mistakes does not mean that a witness is not telling the truth intentionally.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attributed to that testimony.

As I told you, the attorneys in this case are acting as advocates for their competing clients.  They have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate or guess about what the witness would have said if they had been permitted to answer the question.

On the other hand, if the objection was overruled, then you must treat the answer to that question just as you would treat any other question and answer as if no objection had been made.  By allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court in so doing did not indicate any opinion as to the weight or the effect of that evidence.

Now, at various times during the trial, it's been necessary for the Court to talk with the lawyers outside of your hearing either here at the bench or by calling a recess and talking to them while you were outside of the courtroom.

This happens during trials because there are things that arise that do not involve the jury.  You should not speculate or guess about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect evidence, often called circumstantial evidence, which is the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.

As a general rule, ladies and gentlemen, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, certain testimony has been presented to you over the course of the trial through depositions.  A deposition is the sworn recorded answers to questions asked to a witness in advance of the trial.  If a witness cannot be present to testify in person, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath.  At that time, a court reporter was present and recorded their sworn testimony.  Deposition testimony, ladies

and gentlemen, is entitled to the same consideration by you as testimony from a witness in person from the witness stand in open court, and you should judge the credibility and the importance of deposition testimony to the best of your ability, just as if the witness had testified in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.

However, you should not base your decisions on any evidence not presented by the parties during the trial, including your own experiences with any of the products that might be at issue.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the testimony you believe that single witness.

Now, when knowledge of a technical subject may be helpful to you, the jury, a person who has special training and experience in that technical field--we call them an expert witness--is permitted to state his or her opinions on those

1246

technical matters.  However, you're not required to accept any expert witness' opinions.  You're not required to accept any witness' opinions, and it is solely up to you to decide on whether or not you'll accept the testimony that's offered.

Now, certain exhibits have been shown to you over the course of the trial which were simply illustrations.  We call these types of exhibits demonstrative exhibits, or simply demonstratives for short.  Demonstrative exhibits are a party's depiction, picture, or model to describe something involved in the trial.

If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection of the evidence.  Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits, ladies and gentlemen, themselves are not evidence, but a witness' testimony concerning a demonstrative is evidence.  These demonstratives, demonstrative exhibits, are not going to be available for you to review during your deliberations.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues.  And there are two types of burdens of proof that you will apply in this case.  The first is the preponderance of the evidence, and the second is clear and convincing evidence.

The Plaintiff in this case, General Access Solutions, which you've heard called simply General Access or the Plaintiff, has the burden of proving patent infringement by a preponderance of the evidence. General Access also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

As you've heard, the Defendants in this case are Cellco Partnership, doing business as Verizon Wireless; Verizon Services Corp; Verizon Business -- Verizon Global -- excuse me, Verizon Business Global, Verizon Business Network Services, Verizon Corporate Services Group, Verizon Data Services, and Verizon Online, which you've heard referred to throughout the trial collectively as Verizon.

I've told you previously that, in addition to Verizon, Ericsson has intervened in this case on the side of Verizon, and they intervened after the case was filed. Technically, this means that Ericsson is known as an intervenor. Practically speaking, though, Ericsson is working cooperatively with Verizon to defend against the allegations brought by General Access, which have been brought against Verizon. However, to be clear, ladies and gentlemen, Verizon

1248

itself [sic] has not been accused of infringement by General Access in this case.

Now, throughout this trial you've heard both Verizon and Ericsson collectively referred to as Defendants.

MR. SUMMERS:  Your Honor --

THE COURT:  Yes.

MR. SUMMERS:  -- the Court misspoke and said that Verizon is not being accused of infringement, and I think the Court meant to say Ericsson.

THE COURT:  I meant Ericsson.  Thank you for that correction.

Ericsson has not been accused of infringement by General Access.  Verizon has been accused of infringement by General Access.

Verizon has the burden of proof of proving invalidity of the Plaintiff's patent claims by clear and convincing evidence.

Now, clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Although proof to an absolute certainty is not required, ladies and gentlemen, the clear and convincing evidence standard requires a greater degree of proof and persuasion than is necessary to meet the preponderance of the evidence standard.

If proof establishes in your mind an abiding conviction

in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, these two burdens of proof are not to be confused in any way with a separate and different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and which has no application in a civil case such as this.  Beyond a reasonable doubt is a higher burden of proof than clear and convincing evidence and a higher burden of proof than the preponderance of the evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions.  I'll then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, this is an action for patent infringement.  General Access contends that Verizon infringes certain claims of the patents-in-suit.  Remember, there are two United States patents-in-suit, and they are U.S. Patent No. 7,230,931, which you've heard referred to throughout the trial as the '931 or the '931 Patent.

The second U.S. patent at issue is United States Patent No. 9,426,794, which you've heard referred to as the '794 or the '794 Patent throughout the trial.

Now, the Plaintiff General Access contends that Verizon has infringed the asserted claims of the '931 Patent by using

in the United States certain base stations used in Verizon's 5G network, specifically Verizon's 5G TDD Ultra Wideband network.

General Access also contends that Defendant Verizon has infringed the asserted claims of the '794 Patent by making, selling, using, or importing into the United States certain fixed wireless routers, dedicated mobile hotspot devices, and mobile phones sold by Verizon.

General Access contends that it is entitled to money damages in the form of a reasonable royalty for Verizon's infringement.  General Access has the burden of proof on these issues by a preponderance of the evidence.

Verizon denies that it infringes any of the asserted claims of either of the two patents-in-suit.  Verizon denies that it makes, uses, offers for sale, sells, or imports any accused product that infringes any of the asserted claims. Verizon also denies that it owes General Access any money damages.

Verizon further contends that the asserted claims of the patents-in-suit are invalid for a lack of an adequate written description and for a lack of enablement.  Verizon has the burden to prove invalidity by clear and convincing evidence.

Invalidity and infringement are separate and distinct issues.  Now, your job is to decide whether Verizon has infringed the asserted claims and whether those claims are

invalid.  If you decide that any claim has been infringed and is not invalid, you'll then need to decide what amount of money damages, if any, to be awarded to General Access to compensate it for that infringement.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims, ladies and gentlemen, are those numbered sentences at the end of each patent.  The claims are important because it's the words of the claims that define what the patent covers.  The figures and the text in the rest of the patent provide a description and examples of the invention and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or may cover less than any other claim.  Therefore, what a patent covers depends, in turn, upon what each of its claims covers.

You'll first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

Now, the law says that it is my role to define the terms of the claims, and it is your role to apply my definitions to the issues that you've been asked to decide.  Therefore, as I explained at the beginning of the case, I have determined the meanings of certain language from the claims and I have

1252

provided those to you as definitions and those are in your juror notebooks.  And you must accept those definitions of those words in the claims as being correct.

It's your job to take those definitions that I've supplied and apply them to the issues that you are deciding, including the issues of infringement and the issue of invalidity.

Now, for claims that I have not defined or construed, you're to use and apply the plain and ordinary meaning of that term as it would have been understood by a person of ordinary skill in the art at the time of the invention.

And several times during these instructions and throughout the trial, you've heard reference made to a person of ordinary skill in the art or a person of ordinary skill in the field of the invention.

Someone with ordinary skill in the art is a hypothetical person who is presumed to know all of the pertinent prior art, not just what the inventor or another particular individual may have actually known, in the field of the invention at the time for the application of the patent was filed.

You should disregard any evidence presented at trial that contradicts or is inconsistent with the constructions and definitions that the Court has provided you with.

Now, for claim limitations or requirements that I have not construed--that is, limitations I have not interpreted or

1253

defined--you are to use the plain and ordinary meaning of those limitations as understood by one of ordinary skill in the art, which is to say in the field of the technology of the patent at the time of the alleged invention.

The meaning of the words in the patent claims must be the same, ladies and gentlemen, when deciding the issue of infringement and the issue of invalidity.  As I noted, you've been provided with complete copies of each of the two patents-in-suit inside your juror notebooks, and you may refer to them during your deliberations.

Now, the claims of the patents are intended to define, in words, the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description nor the drawings of a patent can be infringed. Each of the claims must be considered individually.

I'll now explain to you what a patent -- excuse me -- what a claim -- I'll now explain to you how a claim defines what it covers.

A claim sets forth in words a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by the claim.  There can be several claims in a patent and each claim may be narrower or broader than another claim by setting forth more or fewer requirements.

The coverage of a patent is assessed on a claim-by-claim

1254

basis.  And in patent law, the requirements of a claim are often referred to as the claim elements.  You may sometimes hear them called the claim limitations.

When a product meets all of the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.  In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  If a product is missing even one limitation or element of a claim, the product is not covered by the claim, and if the product is not covered by the claim, the product cannot infringe the claim.

Now, the beginning portion, or preamble, of a claim often uses the word 'comprising'.  The word 'comprising' when used in a preamble means including but not limited to or containing but not limited to.  When comprising is used in the preamble, if you decide that an accused product includes all of the requirements of the claim, the claim is infringed.  And this is true if the accused product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue, would be infringed by a table that includes a tabletop, legs, and glue, even if the table also contains other structures such as leaves that would expand the size of the tabletop or wheels that would go on the ends of the legs.

Now, this case involves two types of patent claims: independent claims and dependent claims.  In this case, claims

1 and 19 of the '931 Patent are independent claims, and claims 28 and 29 of the '931 Patent are dependent claims.  Claim 28 of the '931 Patent depends upon claim 1 of the '931 Patent, and claim 29 of the '931 Patent depends on claim 19 of the '931 Patent.

Claim 1 of the '794 Patent is an independent claim, and claims 2 and 5 of the '794 Patent are dependent claims which depend upon claim 1.

An independent claim, ladies and gentlemen, sets forth all the requirements that must be met in order to be covered by that claim.  It's not necessary to look at any other claim to determine what an independent claim covers.

On the other hand, a dependent claim does not itself recite all the requirements of the claim, but refers to another claim for some of its requirements.  In this way, the claim depends on another claim.

A dependent claim incorporates all the requirements of a claim to which it refers, or as we sometimes say, from which it depends, and the dependent claim then adds its own additional requirements.  So to determine what a dependent claim covers, it's necessary to look at both the dependent claim itself and any other claim to which it refers or from which it depends.

A product that meets all the requirements of both the dependent claim and the independent claim from which it -- to

1256

which it refers or from which it depends is covered by that dependent claim.

Now, even though claims 1 and 19 of the '931 Patent are not asserted in this case, the elements recited in claims 1 and 19 are still required elements of the asserted dependent claims 28 and 29, and General Access must prove that all of the claim elements or requirements, including those in the independent claims, are met in order to prove infringement.

Now, in reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare the asserted patent claims, as I have construed them for you, to the accused products to determine whether or not there is infringement. This is the only correct comparison.

You should not compare the accused products with any specific examples set out in the patent in reaching your decision on infringement. In deciding infringement, again, the only correct comparison is between the accused products and the elements or limitations of the asserted claims as the Court has construed those claims.

Now, you must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both parties over the course of the trial.

I'll now instruct you about the specific rules that you must follow to determine whether the Plaintiff General Access has proven that Verizon has infringed one or more of the patent claims involved in this case.

Here General Access asserts that Verizon has directly infringed the asserted claims of the patents-in-suit by importing or selling the accused products in the United States.

A patent can be infringed directly even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringing the claim.

A patent may also be infringed directly even though the accused direct infringer believed in good faith that what it did was not infringing the patent. Infringement does not require proof that a party copied its product from the asserted claims. Infringement is assessed, as I mentioned, on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another claim. There may also be infringement as to one patent but no infringement as to another patent.

However, if you find that an independent claim on which other claims depend is not infringed, then there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the product meets the additional requirements of any dependent claims that depend from or refer to that independent claim.  A dependent claim contains all the requirements -- or includes all the requirements of any claim to which it refers or from which it depends plus its own additional requirements within the dependent claim itself.

Now, in this case the Plaintiff has accused multiple products of infringing its patents, and you must determine separately for each asserted claim and each asserted patent whether or not there is infringement by each accused product.

In order to prove direct infringement of a patent claim, General Access must show by a preponderance of the evidence that the accused products include each and every limitation or element of the claim.  In determining whether an accused product directly infringes a patent claim in this case, you must compare the accused product with each and every one of the requirements or limitations of that claim to determine whether the accused product contains each and every requirement recited in that claim.  And if it does not, then the accused product does not infringe that claim.

As I've told you earlier, there can be apparatus claims and method claims.  Direct infringement of a method claim occurs only where all the steps of a claimed method are

performed or are attributable to a single party.  An accused product infringes an apparatus claim if it is reasonably capable of satisfying all of the claim elements, even though it may also be capable of non-infringing modes of operation.

A claim requirement is met if it exists in an accused product just as it is described in the claim language, either as I have construed that language for you, or if I did not, as it would have been understood by its plain and ordinary meaning by one of ordinary skill in the art.  If an accused product omits any element recited in a claim, then you must find that particular product does not infringe that claim.

Now, so long as an accused product meets every -- each and every one of the claim requirements of a comprising claim, infringement of that claim is shown, even if the product contains additional features or elements that are not required by the claims.

I'll now instruct you on the rules that you must follow in deciding whether or not Verizon has proven that any of the asserted claims from the asserted patents are invalid.

An issued United States patent, ladies and gentlemen, is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to throughout the trial as either the PTO or the Patent Office, acted correctly in issuing the patent, and this presumption of validity extends to all issued

United States patents.

In order to overcome this presumption, Verizon must establish by clear and convincing evidence that a claim is invalid. Like infringement, invalidity is determined on a claim-by-claim basis, and you must determine separately for each claim whether that claim is invalid. If one claim of a patent is invalid, this does not necessarily mean that any other claim is invalid.

Claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity. In making your determination as to invalidity, you should consider each claim separately.

Now, in patent law, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art. Prior art may include items that were publicly known or that have been used or offered for sale, or references such as publications or patents, that disclose the claimed invention or elements of the claimed invention. Prior art may be authored or created by anyone. An item of prior art may be called a prior art reference.

Now, I've referred to a person of ordinary skill in the field of the invention or a person of ordinary skill in the art. As I mentioned earlier, a person of ordinary skill in

the art is a hypothetical person who is presumed to have known all of the relevant prior art at the time of the claimed invention.

In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to:

1.  The levels of education and experience of the inventor and other persons actively working in the field;

2.  The types of problems encountered in the field;

3.  Previous solutions to those problems;

4.  The rapidity with which innovations are made; and

5.  The sophistication of the technology.

For the '931 Patent, General Access contends that a person of ordinary skill in the art would have had at least a Bachelor of Science in computer science, computer engineering, electrical engineering, or an equivalent field, and at least two years of academic or industry experience in any kind of networking field.

Defendant Verizon contends that a person of ordinary skill for the '931 Patent would have a Bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, and around two years of work, research, or experience in digital communications systems, such as wireless communications systems and networks, or equivalent, or a Master's degree in electrical engineering,

computer engineering, computer science, or a similar field.

For the '974 [sic] Patent, General Access contends that a person of ordinary skill in the art would have had at least a Bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent field, as well as at least two years of experience working in the field of telecommunications, network analysis and design, and/or mobile communication device design.

Verizon contends that a person of ordinary skill in the art for the '794 Patent would have had either a Bachelor's degree in computer science, electrical or computer engineering, or a related field, and at least two years of work or research experience in digital communication systems, such as wireless communication systems and networks, or the equivalent, or a Master's degree in electrical engineering, computer engineering, computer science, or a similar field. Additional education could compensate for less practical experience and vice versa.

Verizon also contends that the asserted claims of the patents-in-suit are invalid for failure to provide an adequate written description of the full scope of the claimed invention.  Verizon bears the burden of establishing by clear and convincing evidence that the specification fails to satisfy the written description requirement.

A patent must also contain a written description of the

product or method claimed in the patent.  The written description requirement helps ensure that the patent applicant actually invented the claimed subject matter.  To satisfy the written description requirement, the patent specification must describe each and every limitation of a patent claim with clear, concise, and exact terms.

When determining whether the specification discloses the invention, the claim must be viewed as a whole.  The written description requirement is satisfied if persons of ordinary skill in the field of the invention would recognize from reading the patent specification that the inventor possessed the subject matter finally claimed in the patent.

The written description requirement is satisfied if the specification shows that the inventor possessed his or her invention as of the effective filing date of the claimed invention, even though the claims may have changed or new claims have added -- have been added since that time.

The exact words found in the claim need not be used in the specification.  It's unnecessary to spell out every detail of the invention in the specification, and specific examples are not required.  Enough must be included in the specification to convince persons of ordinary skill in the art that the inventor possessed the full scope of the invention. The written description requirement may be satisfied by a combination of words, structures, figures, diagrams, formulas,

et cetera, contained in the patent application.

In evaluating whether the specification has provided an adequate written description, you may consider such factors as:

1.   The nature and scope of the patent claims;

2.   The complexity, predictability, and maturity of the technology at issue;

3.   The existing knowledge in the relevant field; and

4.   The scope and content of the prior art.

The issue of written description is decided on a claim-by-claim basis, not as to the entire patent or group of claims.

Now, another way a patent claim can be invalid is if the specification of the patent fails to disclose sufficient information to enable or teach persons of ordinary skill in the field of the invention at the time the patent application was filed to make and use the full scope of the claimed invention without undue experimentation.  This is known as the enablement requirement.

Verizon contends that the asserted claims of the patents-in-suit are invalid for lack of enablement.  If a patent claim is not enabled, it is invalid.  In considering with whether a patent complies with the enablement requirement, you must keep in mind that patents are often written for persons of ordinary skill in the field of the

invention.  Thus, a patent need not state information that persons of ordinary skill would likely know or could obtain without undue experimentation.

Factors you may consider in determining whether persons of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include the following:

1.  The quantity of experimentation necessary and whether that experimentation involves only known or commonly used techniques.  The question of undue experimentation is a matter of degree.  Even extensive experimentation does not necessarily make the experiments unduly intensive where the experiments are routine, such as repetition of known or commonly known techniques, but permissible experimentation is not without bounds;

2.  The amount of direction or guidance disclosed in the patent;

3.  The presence or absence of working examples in the patent;

4.  The nature of the invention;

5.  The state of the prior art;

6.  The relative skill of those in the art;

7.  The predictability of the art; and

8.  The breadth of the claims.

No one or more of these factors is alone dispositive.

Rather, you must make your decision about whether or not the degree of experimentation required is undue based upon all the evidence presented to you.  You should weigh these factors and determine whether or not in the context of the invention and the state of the art at the time of the patent's effective filing date a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.

The question of enablement does not turn on whether the accused product is enabled or whether a commercially viable product has been developed.

Now, if you find that Verizon has infringed any claim of the asserted patents, you must then consider what amount of damages, if any, to award to General Access.

I'll now instruct you about the measure of damages.  But by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If you find that Verizon has not infringed any claim of the patents-in-suit, then General Access is not entitled to any patent damages.

General Access has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only damages that General Access establishes that it more likely than not suffered as a result of Verizon's infringement.

While General Access is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  General Access is not entitled to damages that are remote or that are only speculative.

The damages that you award, if any, must be adequate to compensate General Access for any infringement that you may find.  You must not award General Access more damages than are adequate to compensate for the infringement.  You must also not include any additional amount for the purpose of punishing Verizon or for the purpose of setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

In this case, General Access seeks damages in the form of a reasonable royalty.  A royalty is a payment made to a patent owner in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed the patent was valid and infringed and that

both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating a reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits of an alleged infringer may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

The law requires that any royalty awarded to General Access correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented features of the accused products.

Now, the amount you decide to award as money damages must be based on the value attributable to the infringing features of the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing, advertising, or the parties' size or market positions.

A royalty compensating the patent holder for damages must reflect the value of the claimed invention attributable to the

infringing features of the product and no more.

The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.  When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features as distinguished from non-patented elements, the manufacturing process, business risk, or significant features or improvements added by the infringer.

In this case, asserted claims 28 and 29 of the '931 Patent are dependent claims, and they depend from independent claims 1 and 19, respectively.  However, independent claims 1 and 19 are already within the public domain.  Thus, an award of damages for infringement of claims 28 and 29 of the '931 Patent must be based solely on the value contributed by the features of those claims, as opposed to the features of independent claims 1 and 19.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began.  The parties agree that the date of the hypothetical negotiation for the '794 Patent is in 2016 and for the '931 Patent is in late-2018 or early 2019.

Now, some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for the

1270

licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.   The rates paid by the licensee for the use of the patents comparable to the patents-in-suit.  Comparables license agreements include those covering the use of the claimed invention or similar technology;

3.   The nature and scope of the license as exclusive or non-exclusive, or as restricted or non-restricted, in terms of territory or with respect to whom the manufactured product may be sold;

4.   The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.   The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.   The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention of the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.   The duration of the patent and the term of the license;

8.   The established profitability of the product made

1271

under the patents, its commercial success, and its current popularity;

9.  The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10.  The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention;

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.  The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.  The opinion and testimony of qualified experts; and

15.  The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been trying to reasonably and voluntarily reach an agreement; that is, the

amount which a prudent licensee--who desired as a business proposition to obtain a license to the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the *Georgia-Pacific* factors.  No one of these factors is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent owner or holder would have been willing to accept, acting as normally prudent business people.

Now, in determining a reasonable royalty, you can also take into account whether Defendant Verizon would have implemented any non-infringing technologies as an alternative to the patented inventions.  These are called non-infringing alternatives.  The Plaintiff has the burden to persuade you that no viable, commercially acceptable, non-infringing alternatives existed.

Non-infringing technologies include not only existing technologies that do not infringe, but also technologies that could reasonably have been developed that would not -- and

that would not infringe.  A defendant does not have to actually use a non-infringing technology during the infringement period for that technology to be a non-infringing alternative.

When determining the reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patent in question or for rights to similar technologies.  Thus, comparable license agreements are one factor that may inform your opinion as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

Such licenses may include the patented inventions' economic value in the marketplace, and they may indicate the proper form of the royalty structure, such as a lump sum or a running royalty.

A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between the patent owner and the alleged infringer in order for you to consider it.

However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license in terms of the technologies and economic circumstances of the contracting parties when you make your

1274

reasonable royalty determination.

In determining the amount of damages, you must determine when damages began. Where you find that an asserted claim has been infringed and is not invalid, you may not award any damages for activities occurring before the damages start. A patentee is not entitled to damages for any infringement committed more than six years prior to filing of the claim for infringement.

The damages period would have begun in April of 2019 for the '931 Patent. The '931 Patent will expire on August the 28th, 2024. So the damages period for the '931 Patent will end on August 28th, 2024. For the '794 Patent, the damages period would have begun in October of 2016. The '794 Patent expired on June the 23rd, 2021. So the damages period for the '794 Patent would have ended on January [sic] the 23rd, 2021.

Now, ladies and gentlemen, with those instructions, we'll proceed to hear closing arguments for the competing parties in this case.

The Plaintiff may present its first closing argument to the jury.

Would you like a warning on your time, Mr. Knobloch?

MR. KNOBLOCH: Yes, Your Honor. Can you please let me know after I've used 15 minutes.

THE COURT: I will warn you when you have used 15 minutes.

You may proceed with Plaintiff's first closing argument.

MR. KNOBLOCH:  Thank you, Your Honor.

Ladies and gentlemen, good morning.

In 2001 Mr. Struhsaker came up with something that no one had done before--a way to make beamforming work with TDD in a wireless network.  This solution that he came up with provided the bedrock of modern beamforming TDD communications, and no one here in this courtroom is challenging that Mr. Struhsaker's inventions were innovative and new.

The invention of the '931 Patent, Mr. Struhsaker's TDD beamforming patent, has saved Verizon $1.7 billion in infrastructure costs.  Those are costs that had Verizon not had access to the invention of the '931 Patent, it would have had to spend to have the same network performance that it currently has.

We are here because Verizon is using our technology without paying for it.  When this case is submitted to you and you begin your deliberations, you will need to decide three issues--infringement, validity, and damages.  Let's briefly discuss each of them.

As you heard, General Access has the burden of proof on the issue of infringement.  The standard of the proof is the preponderance of the evidence, and you heard about that today. The scales of justice on the statue right there, they've been here all week, and the preponderance of the evidence requires

that we tip the scales in our favor.  The evidence that we showed tips those scales decisively in our favor.

You heard from Doctor Madisetti.  He walked through each and every limitation of the asserted claims and explained why each and every one was met.  Now, luckily for all of us, we don't have to go through all of them again right now, but there are a few that I want to talk about, specifically two.  And the first one that I want to focus on is the broadcast beam signal limitation.

And the claim language is what matters here, and what the claim requires is that the transmission -- is a transmission of a broadcast beam signal at the start of a TDD frame.  Nothing in the claim requires that the contents of that broadcast beam signal be identical to all the sectors.  It's not required.  It doesn't say that the broadcast beam signal has to be sent from a single antenna.  That's not in the claim.

What's in the claim is that there needs to be a broadcast beam signal at the start of the frame sent to multiple sectors, and that's exactly what Verizon's network does.

You've seen a lot about this synchronization signal block, the SSB.  Defendants' own admissions establish that the SSB is the claimed broadcast beam signal.  The SSB is the synchronization signal that is sent at the start of the frame.  The SSB includes content that is identical to every sector.

For example, the system frame number. Ericsson's own -- Mr. Faxer confirmed that the same system frame number is sent to users in every sector in the SSB. And this happens at the exact same time to every sector. The three antennas at the top of the Verizon base stations, they send this information at the exact same time to every sector.

Verizon's corporate representative, Mr. Rice, also agreed that in Verizon's network the BBU, that's the computer in the cabinet at the bottom of the base station that controls the whole thing, it tells the antennas to send the SSBs at the same time.

Now, Verizon spent a lot of time talking about the ways in which the SSBs sent to the different sectors are different from each other because they include things like scrambling, like scrambling that's different or sector IDs that are different, but that is irrelevant because Verizon cannot avoid infringement simply by adding things that go beyond what the claims require because these are comprising claims. There's no dispute that these are what the Court has called comprising claims.

And like the Court instructed you, a comprising claim is infringed even if the accused product contains additional elements like a table -- like a claim on a table that also adds wheels, that's still infringed. If I have a claim that covers a table and you just have a table that has the same

1278

table but it adds wheels, that table infringes my claim.

And it's the same thing here.  Verizon infringes even if the SSB broadcast at the start of the frame includes additional things that are not required by the claims.  That simply does not matter.

The next limitation from the '931 Patent that I want to focus on is the said TDD frame limitation and, specifically, that the directed scanning beam signals are sent to users in multiple sectors during the same TDD frame.

Now, there's no dispute functionally that there are beamform transmissions sent from multiple antennas at Verizon's base stations to users in multiple sectors.  These beamform transmissions are sent at the same time and they actually use the same system frame number.  They are part of the same frame.

This is testimony from Ericsson's own Mr. Fortes, and he confirms that when multiple beams are transmitted, they are all part of the same system frame number.

And Mr. Faxer agreed with that, too.  He testified that the same system frame number as the information payload that is used in the SSBs.  The information payload, that's the directed scanning beam signals.  That's the information, the data, that is sent to the users on those beamform signals.  Those are all part of the same system frame number.

So when it designed its network, Verizon recognized that

the transmissions at the same time from the same base station are part of the same frame.  That's why they gave them the same system frame number--because they're all part of the same frame.

Now, Doctor Andrews said, yeah, they may have the same system frame number, but they're still different frames because, in his opinion, a frame is a container, it's an egg carton.

But that's not right.  The specification explains that a TDD frame is simply a timetable.  It consists of a set of time slots for uplink and for downlink, and it's a schedule.  The specification explains it is a timing architecture to align the downlink transmissions in the different sectors of a cell site, both for the broadcast beam signals and for the directed scanning beam signals.  They are all aligned; they all share the same TDD frame.

And the claims, the schedule, the timing architecture required by the claims is simple.  It's a broadcast beam signal transmitted to multiple sectors at the start of the frame and then downlink scanning beam signals transmitted to users in multiple sectors during that same frame.  And that is exactly how Verizon's network works.

Now, you heard from one witness who disagreed with that--Doctor Andrews.  He says that the broadcasts transmitted by Verizon's base stations are not the claimed broadcast beam

signals because they're sent from different antennas.

He also said that the downlink scanning beam signals, the downlink data sent to the users in the different sectors at the same time in the same system frame number, they're not part of the same frame because they are sent from different antennas.

Those opinions are wrong.  They're wrong because they ignore the Court's construction of a transceiver.  The Court has included in your notebooks this construction of a transceiver, one or more.  A transceiver is not limited to one antenna.  In the claims of the '931 Patent, a transceiver refers to one or more antennas.

And that's really important, because something very interesting happened yesterday when Mr. Hughes was cross-examining Doctor Andrews.  Mr. Hughes put up a slide showing the constructions that you have in your notebooks on the left-hand side and on the right comparing those to the definitions that Doctor Andrews had applied in his report.

And what we noticed was that one of the constructions from the Court were missing from Doctor Andrews' report.  So Mr. Hughes asked him about it.  He asked him whether he'd applied this construction in his analysis even though he hadn't put it in his report.  And what Doctor Andrews said was very surprising.  He was not aware that the Court had ordered everyone to interpret the term 'a transceiver' as one or more

transceivers.  The Defendants simply never gave him that instruction.

This admission is really important.  The Court's construction makes it clear that the broadcast beam signals and the downlink data beam signals, all of that can be transmitted by more than one antenna.

Verizon's expert came here and testified that transmissions from multiple antennas to multiple sectors don't satisfy the claims of the '931 Patent.  But Verizon never told him in that -- in this patent a transceiver means one or more transceivers.  Ask yourself, why didn't Verizon give him that information.

I'd like to move on to validity.  As you've been told, for both written description and enablement, the Patent Office has already determined that the claims in this case meet both the written description and enablement requirements.

And the Patent Office had all the information it needed to make that determination.  It had the patent specification, it had the claims, and it knew about all -- and it knew about the prior art.  That's why the claims are presumed to be valid.  And that's why Defendants have to prove invalidity with clear and convincing evidence.  That is a burden that these Defendants have not and cannot meet.

Starting with written description, the patent specification clearly describes the claimed inventions.  You

heard a lot from Verizon about how the '931 Patent focuses on one sector, but let's look at what the specification actually shows.  Here is an annotated figure of figure 2 from the specification.  That's one of the figures that you'll find in your notebooks from the '931 Patent.

And what does the spec -- what does the specification explain about this?  It explains that each base station covers a cell site area that is divided into a plurality of sectors in the plain language of the specification.  The specification also explains that messages are broadcast from the base station to all subscribers.

And, remember, the base station is what is -- is the thing in the middle.  It's not limited to one of the antennas you see at the top.  It's all of them.  And what does that base station do?  It broadcasts.

When the base station transmits to all subscribers, that necessarily means transmitting from multiple antennas because, as you see here, there -- you only see three, but there's four because there's four sectors here.  It's just the last one is kind of hidden in the back.  Each sector has its own antenna, and the transmissions from those antennas to those sectors are the broadcast beam signals of the claims, plainly described in the specification.

Turning to enablement, the Court's instruction makes clear the patent does not need to state what a person of

1283

ordinary skill would be likely to know or could obtain without undue experimentation.  General Access didn't need to enable all -- anything and didn't need to describe things that the -- that the person of ordinary skill would already know.

And Verizon has focused a lot on the issue of mobile beamforming.  They've said, well, you know, the '931 Patent lacks enablement because it didn't enable mobile beamforming.  That's been their focus.  But back in 2001 we already had mobile phones.  They already existed, and there was also mobile beamforming.  This is the Scott patent that the patent examiners had in front of them when they determined that the '931 Patent claims were valid.

And the Scott patent shows user stations receiving beamform signals.  Those user stations, these cars, they're mobile.  They can drive.  And they are receiving beamform signals.

So the issue was not mobile beamforming.  The issue that Mr. Struhsaker solved was how to get TDD and beamforming to work together in a wireless network.  That invention, his solution to that problem, which Scott didn't solve, was fully enabled.

THE COURT:  You've used 15 minutes, counsel.

MR. KNOBLOCH:  Thank you, Your Honor.

You've heard all week from Verizon about how General Access didn't enable the invention because of all the work

that went into building Verizon's commercial network or Ericsson's commercial products.

You saw the video they shared at the beginning with the beams bouncing off buildings, and you heard again and again from Verizon that the claims are not enabled because of the work that back in 2001 was still left to be done to commercialize the technology described in the '931 Patent.

But all of that is irrelevant because the Court's instruction makes clear that the question of enablement does not turn on whether the accused product is enabled.  That is not the standard.  It does not matter whether the '931 Patent enabled Verizon's network or whether a commercially viable product has been developed.  Again, that doesn't matter.

There's no -- and there's also no dispute that Ericsson and Verizon have come up with innovations of their own that built on the foundations of the '931 Patent.  The fact that they had that work left to do after the '931 Patent is not relevant to the issue of the enablement and written description requirements that you need to decide.

So turning to damages, you heard Mr. Kennedy explain why damages are tied to the infringer's, in this case Verizon's, use of the invention, and Verizon's use of the invention here is massive, more than 75,000 5G TDD base stations.  And every single one of the transmissions from those base stations infringes the '931 Patent because they always use beamforming.

1285

And you heard how much that matters to Verizon, because it makes their network work 32 percent better.  32 percent is a lot.  If Verizon's network suddenly worked 32 percent less well, it would need to compensate for that by building out more infrastructure, by building out more base stations.  That is the value of the '931 claims to Verizon.  That is what Verizon gets by infringing.

Now, I'd like to turn to the '794 Patent.  You heard how -- this is the one about hotspots, and we went through all -- Doctor Madisetti went through all of the -- all of the elements of these claims and showed that they were met.

And you heard about how Verizon's hotspots work.  They have two transceivers, one that receives a signal from the base station, from the cell tower, and a second one that communicates with things like laptops and iPads as shown on the right, the second transceiver.

There's no dispute that Verizon's accused products have two transceivers that work in these ways, one that talks to a cell tower and one that creates a WiFi network that you can -- that can talk to devices downstream.

The dispute, the issue here, is how that second transceiver communicates with the laptop, for example, how it monitors, how it routes.  Monitoring is simple.  Before sending information to your laptop, the hotspot needs to know whether it has a good connection, so the hotspot and the

1286

laptop exchange information back and forth.  Those exchanges include things like reports from the laptop about the received signal strength, or RSSI, that you heard about.  And they also talk back and forth to each other and they say, can you hear me, can I hear you, okay, now we can communicate.  That's the reciprocity that Doctor Madisetti talked about.

Now, once the second transceiver, the one on the right, the WiFi transceiver, figures out that it has a good signal, that it can actually -- that the mobile station and -- or the laptop can actually hear what it's trying to say, then it routes information.  It's a WiFi router.  It routes information to that laptop or to that iPad by directing the information over the specified path.

And you see the path right here--it's the WiFi path.  It's the way in which information goes from the second transceiver to things like your laptop or your iPad.  And Verizon's own witnesses agree that that's exactly how its products work.

This is also exactly what's described in the specification of the '794 Patent.  The '794 Patent explains that measurements are taken at the mobile station.  Remember, the mobile station is like a laptop.  It reports those back to the WLAN transceiver.

The WLAN transceiver, that's the WiFi transceiver.  And so that gets reported back to the WiFi transceiver.  The WiFi

transceiver, thus, monitors that information.  It receives it, it monitors it, it says, okay, do I have a good connection.  And then after that, if appropriate, handover of communications is effectuated, again in just the plain language of the specification, exactly how this works in the claims.

Now, you also heard from Mr. Kennedy about the '794 Patent and about how much Verizon uses the '794 Patent.  Now, Verizon is able to charge $32 more per device because of its use of the '794 Patent.  That's how much more it can charge for the devices it sells to its customers because it has the features of the '794 Patent.

And they sell a lot of these devices, nearly a hundred million of them.  That's a lot of money that Verizon gets to charge its customers for the use of the '794 Patent.  And the reasonable royalty that General Access is seeking for that is just $2.79 per infringing device.

Now, you're going to hear from Mr. Krevitt next.  Please evaluate what he has to say from the perspective of the three issues that matter--infringement, validity, and damages.

Thank you very much for your attention and your service.

THE COURT:  All right.  Defendant may now present its closing argument.

Would you like a warning on your time, Mr. Krevitt?

MR. KREVITT:  Yes, Your Honor.  Three minutes left

in total would be great.

THE COURT:  You want me to warn you when you've used 37 minutes?

MR. KREVITT:  Yes, Your Honor.

THE COURT:  All right.  You may proceed.

MR. KREVITT:  We're going to figure this out.  Thank you.  Thank you, Your Honor.

Good after -- good morning.  Excuse me, ladies and gentlemen.  It's a pleasure to be finally speaking with you-all again.  After we spoke on Monday, we then have to sit there.  We have to watch the evidence.  We don't get to speak with you.  And so it's now our time to be able to speak with you which is a real pleasure for us.

We're going to end the way we began.  I'm going to speak with you for a little bit, and then Mr. Dacus, if I leave him any time, is going to visit with you-all.

First, we want to thank you-all for your service this week, for the focus, the care, the attention that you paid.  It's not always easy.  You've been bombarded with a lot of information and expected to take a lot in, of course.  But this case is very important to Verizon.  Verizon's been accused of infringement, something it's never done.  That's a serious charge.  But Verizon has not infringed either one of these patents, not in its 5G network, not anywhere else.

Now, I promised at the outset that we were going to try

1289

to make everything as clear as possible, that we were going to try to keep things simple and straightforward, and that was our goal, because we wanted you to understand the evidence. Because once you understand the evidence, we were confident that you would see that Verizon does not infringe either patent and that the patents are invalid and that Verizon doesn't owe anything.

And one of the best parts of trials -- and I'm going to talk about the patents in just a moment, but one of the best parts of trials, and Judge Gilstrap talked about this, is you're able to assess credibility. You're able to look witnesses in the eyes, see who's being straight with you, who's telling the truth, who may be evading. That's real important. It was in the instructions and it's real important in this case.

You met Mr. Rice, our corporate representative from Verizon. You met David Wolff. You met Sebastian Faxer who flew in representing Ericsson in this case. Each one of them knows the network, knows how it works, what it does, and they all explained to you why it doesn't do what these patents require. They all took the oath, looked you in the eye, and told you factually how this network works and why it doesn't do what the claims require. And you can't find infringement in this case if you believe these men came here and told you the truth.

You also heard Doctor Andrews.  He's one of the leading experts in the world in mobile communications and cellular networks.  It's the only thing he does.  It's his entire world.  He testified that he doesn't take on any case unless he's a hundred percent sure he's right.  You remember that? He's turned down 30 cases this year alone.

And you can compare his testimony to that of Doctor Madisetti, a professional expert, an expert who seems to be an expert in or is at least willing to provide expert testimony regarding every single technology there has ever been. Couldn't get off the stand fast enough when Mr. Rosenthal was questioning him yesterday.

You get to assess their credibility.  You get to compare them.

You heard Mr. Struhsaker, the inventor in this case, came because General Access asked him to come.  He's here now.  He took the stand and he told you the truth.  He told you, I didn't invent beamforming in mobile.  He told you that was years away.  He told you, I didn't write the claim, the elements that are in this patent, someone else did that long after I was gone.  Point after point after point, what Mr. Struhsaker said supported Verizon's positions in this case.

And you heard from Mr. Hynek.  So you're in a position to assess credibility, that's your job, and I think it's important in this case.

1291

Now, as I told you at the start and as we have all now seen, General Access, Mr. Hynek, came here trying to get almost a billion dollars, trying to take credit for how beamforming is done in a mobile network, something Raze did not invent, something Raze never said it invented at any time.

Mr. Struhsaker took the stand and disagreed with General Access, said what General Access said was not true.  He said clearly under oath, I did not invent beamforming in mobile.  He was indignant.  He said, I never said I did.

The only one who has ever said at any time that Raze invented beamforming in mobile is General Access when it has been trying to get money for its patents.  I told you there would be no support for that claim, and there was not any.

Now, there are some things everybody agrees on in this case.  Raze -- these patents come out of the work that Raze was doing back in 2000, 2001.  They were around for a couple of years.  They were involved in a fixed network.  No dispute about that.  That's all they did.  Their own documents, purely a fixed network, does not support mobility.  They didn't do a thing in mobility, they didn't touch mobility, not once, never.

And there's something else pretty much everyone agrees, and I say pretty much because Doctor Madisetti was the outlier.  All of the engineers, all of the fact witnesses, Doctor Andrews, Mr. Struhsaker, everyone agreed that

beamforming in mobile is different, much more complicated, much more difficult, incredibly complex technology, took hundreds of companies, thousands of engineers, decades to figure that out, long after Raze shut down, long after the patents in this case, long after Mr. Struhsaker had moved on.

You heard that also from Mr. Faxer, of course, and Mr. Rice. You heard it from every single one of the witnesses, and they talked about that process about developing beamforming in mobile.

Here are some examples, if we go back, patents that issued out of that process, patents that actually deal with beamforming in mobile, patents that actually talk about beamforming in mobile.

So that's what Raze was doing. And despite all of that -- you can take that down, Mr. Eaton.

Despite all of that, despite all the testimony by all the witnesses about what Raze was doing and what Raze was not doing, how difficult beamforming in mobile was and the fact that Raze never touched it, never worked on it, never thought about it, General Access is here now asking you for tons of money claiming that Raze invented beamforming in mobile decades ago. By now, you know that's not true, but that's what's been going on in this case.

Now let's look at the patents. As I said, these patents, both of these patents, came out of the work that Raze was

doing out of its fixed network.  Now, there was some discussion of the prosecution.  There was some suggestion that we were saying there was sinister stuff going on, so let me be really clear:  That's not our point.

Our point is simple and it's factual--Raze applied for patents, those patents were rejected, by the time those patents were rejected, Raze was out of business, Mr. Struhsaker had moved on, and General Access amended the claims.  Nothing wrong with that, but that's what happened. And Mr. Struhsaker testified under oath he didn't write the claims, he didn't see the claims, he wasn't involved in preparing the claims.  The new claims, excuse me, the amendments.

Here are the amendments.  They were added to the claims during prosecution, and they eventually became part of the actual patent claims in this case.  You heard Mr. Venglarik. It was by videotape, the patent prosecutor, you may recall. He testified, I prepared the claims in this -- that wound up in the patent, it took me a few hours, I filed them, the patent issued.

You heard Mr. Struhsaker testify that he filed an oath when he filed the original patent application, saying, these are mine, I invented these.  Do you remember that?  But he testified he didn't do that oath the next time because he wasn't involved in those patents, had nothing to do with them,

the amendments.

So a patent lawyer that Mr. Hynek hires changes the claims, get filed with the Patent Office, they get issued. Those are the claims we're dealing with. Those are the patents in this case.

And if we go forward, please, Mr. Eaton.

Those claims had two requirements added. You need one broadcast beam signal that goes to multiple sectors. If they can't show you one broadcast beam signal, a signal that goes to more than one sector, there is no infringement.

What did they show you? And this is amazing. You may recall, I stood here a few days ago on Monday and talked to you-all, and I made a big deal. Some of my colleagues told me I was too revved up. And I kept saying, show me. If there's any evidence, if they have a document, if there's anything that actually says what they're telling you, show me, put it on a screen, show the jury.

And I was confident to say that -- I've never done that in all my years because it's scary because maybe they will. But I was confident to do it in this case because I knew no document exists.

We've produced 2 million pages of documents in this case. Every single aspect of our network, every minute detail of our network is written down, it's documented. This isn't, you know, you're just winging it. Every single aspect of our

network is written down precisely.  Mr. Rice has documents that can show you every single aspect of our network.

And so I said, if there is a broadcast beam signal that goes to more than one sector, show me.  Show the jury.  I knew they wouldn't be able to, and they didn't.  And we're now here on Friday, and Mr. Knobloch presented to you and said there is infringement.  We have the burden of proof, he said, and we are proving infringement to you.

And what did he not put on the screen?  He put this cartoon that they created.  He put this cartoon on.  What did he not show you?  A single document, not one.

For the broadcast beam signal, General Access alleges that the SSB -- you heard a lot of talk about it.  But where we are now, we know there is something called an SSB, and it's what they claim is the broadcast beam signal.  So in order to prove infringement, they must show that there is one SSB that goes to more than one sector.  That's what they need to show.

What did they do?  They put this cartoon, and they put two quotes from deposition testimony, neither of which said that.  I knew they wouldn't be able to, again because our SSB doesn't go to more than one sector.

Now, when Doctor Madisetti first testified, they did put documents on.  You could show this document, they put this on the screen and made a big deal about it, said Mr. Krevitt said, show me, we don't show documents, is this a document.

1296

But then it came out on cross examination, this is showing one sector. That's one sector at the bottom right, that hexagon.

So then they showed another document, another big deal. Krevitt said we wouldn't show documents; here are documents. It shows the SSB going to one sector. And when he was cross-examined, Doctor Madisetti admitted it.

So the documents that they showed you that Doctor Madisetti put up and tried to convince you that showed an SSB going to more than one sector didn't, they don't exist, they proved exactly the opposite.

Every single document, actual document, that relates to Verizon's network shows this, which you did not see, which was not shown by General Access, which is an SSB, a broadcast beam signal going to just one sector, because that's how the system works.

Every engineer said the same thing. Mr. Rice said it, Mr. Faxer said it, Mr. Wolff said it, Doctor Andrews said it. No gray, no doubt, the SSB goes only to one sector in Verizon's network. That's how it works, and that's a fact.

Now, at some point they kind of shifted and they said, well, all right, fine, maybe the SSB doesn't actually go to multiple sectors as the claims explicitly require, but it carries some of the same information, they go out at the same time, so you can kind of think of them all as one signal.

That's not how it works. Judge Gilstrap's instructions

could not have been clearer:  The claims define the scope, the claims require a signal, one, that goes to more than one sector, not a collection of signals that go to different sectors, one signal, one SSB, multiple sectors.  They can't show it because it doesn't exist in our network.

It's the -- and, in fact, Doctor Madisetti, just to round this point out, admitted that the SSBs that are going to different sectors are different signals.  So he admitted that the SSBs in our network are different signals going to different sectors.  The claim requires one signal to multiple sectors.  It does not exist in our network.

So, finally, we show up here on Friday, and Mr. Knobloch gets up here, he puts that cartoon of the yellow and then a table.  And he says, well, you don't have to worry about any of this because these are comprising claims.  That is all sleight of hand.  The claims define the scope of the invention; the claims require one signal to multiple sectors.

Of course, you could have more.  If a claim requires a table and legs, you can add wheels.  But what can you not do?  You can't get rid of the tabletop.  These claims have requirements.  The requirements are one signal, multiple sectors.  Verizon doesn't do it.  I said, show me.  They didn't.  I just showed you.

It's the same with the TDD frame.  It's the other requirement in this claim.  A TDD frame must go to multiple

sectors.  One TDD frame, multiple sectors.

What did Mr. Knobloch show you?  He showed you one snippet of testimony that did not address the question.  And not only did it not say, oh, yeah, in Verizon's network a TDD frame goes to multiple sectors; it didn't even address the issue.  And that's because having gotten 2 million pages of documents and poured through them all, having deposed Mr. Rice multiple times, everybody about our network, we sit here today and there is no evidence that a TDD frame goes to more than one sector because it doesn't.  It would defeat the purpose of sectorization.  That's what Mr. Rice talked about.  That's what Mr. Wolff talked about, Mr. Faxer, and Doctor Andrews.  Why we sectorize, why it's so important that the sectors remain separate, and why there are no instances in which a signal, SSB or any other, or a TDD frame ever goes to more than one sector.  And that's why we don't infringe.  That's why they can't come close to proving that we do, the burden that they have, because it never actually happens in our system.  Two requirements that General Access added long after Mr. Struhsaker left, two things for the '931 that Verizon does not do, two separate independent reasons Verizon does not infringe.

Let's look at validity quickly on the '931.  There are two validity arguments.  I want to make sure you understand they are separate.  One is written description, one is

enablement. The reason I say I want to make sure you understand they are separate is you are going to get a verdict form at some point when you go off to deliberate, and the question will be just validity. The question doesn't break it out in this way. But if you find there is no written description, the patent is invalid. If you find there's no enablement, the patent is invalid for that separate independent reason. And, of course, if you find both, the patent is invalid. But either one is sufficient for you to find the patent is invalid.

And you will recall that written description is the question about whether the requirement, every requirement, every single requirement that winds up in the claims was in the original application. Remember, these elements were added by General Access after Mr. Struhsaker took off. He had nothing to do with them. So the question is, were those requirements that were added by other people, were those requirements actually in the original application that Mr. Struhsaker filed? And the answer is clearly no.

What we showed -- what Mr. Rosenthal showed in talking with Doctor Madisetti and what Ms. Dominguez showed in talking with Doctor Andrews is that the entire patent is about just one sector. These requirements about a broadcast beam to multiple sectors and a TDD frame to multiple sectors were not in this patent because the patent was only about what goes to

one sector.

If you go to the next slide.

The Court's jury instructions that you just heard require that the disclosure in the patent be clear, concise, and exact terms.  So you need to find that there is some clear, concise, and exact description of these claim elements.  But you won't find it.  It's not there.

And if you go to the next slide, please.

This is the patent claim, and what Mr. Rosenthal walked Doctor Madisetti through, which we could do very quickly, is every single aspect of the original claims is disclosed in plain English clear as day, easy to read.

Doctor Madisetti kept saying, well, not in English, it's not spelled out in words.  When a claim element is described in the specification, you can read it.  The yellow in the claim is in the patent.  The only thing that is not is the elements in pink, I think that is, which are the new elements.  Those are not in the specification.  Mr. Struhsaker didn't write them.  They weren't what he put in his original patent application.  The lawyers wrote that and put those in later.

So what did Doctor Madisetti say?  Doctor Madisetti said, Trust me.  He kept pointing to things that actually didn't address this.  You remember they were things that -- that talked about other issues.  And he said, well, to one of ordinary skill in the art, that's obvious.  That's what it

means to me.  Trust me.

But that's not how it works.  It's supposed to be clear, concise, and exact.  You should be able to read the claim limitation and find it in the patent.  Doctor Madisetti couldn't do that because they're not there.

So that's the written description.  That's why there is no written description for these elements that were added later.  And because there's no written description, the patents are invalid.

Let's do enablement quickly on the '931.  You've heard a lot about this issue in this case.  The question is whether this patent that was relating only to fixed, no dispute about that that that's what the disclosure was about, these are beams going to fixed houses, whether that would teach anyone to do beamforming in 2001 in a mobile network.  That's the question that you have to decide.

And on that question, we suggest it's not close.  There is literally nothing, literally not a word in the patent about mobile; nothing, let alone how to do that in beamforming.

Mr. Struhsaker testified he had no idea how to do beamforming in mobile at that time.  He was very honest.  No idea how to do beamforming in mobile.  He went so far as to say that if anybody thought that you could take the fixed system that was in the patent and actually do beamforming in mobile from that, you'd be smoking crack.  The inventor said

1302

that to think that you could do beamforming from this patent, if you had that thought, from the fixed network, you'd be smoking crack.

So what did Doctor Madisetti say about that?  How did he possibly suggest that there is enablement then?  He said, Mr. Struhsaker's wrong.

I've been doing this a long time.  I have never seen that.  There is a few things I've never seen.  I've never seen a Plaintiff not put evidence up to show a jury, and I have never seen an expert tell a jury that the inventor was wrong about what the inventor thinks the inventor's patent teaches--that Mr. Struhsaker was wrong when Mr. Struhsaker said that the patent wouldn't teach beamforming in mobile. You remember Doctor Madisetti said, well, it may be -- you know, it's a long time ago, maybe he just forgot.

I heard Mr. Struhsaker's testimony.  He didn't seem forgetful to me.  He testified that nobody knew how to do beamforming, it would take years to figure it out, and in fact that's exactly what happened.  It was so complicated, it was so incredibly complex, that it took hundreds of companies years to figure out how to do beamforming in mobile.

That was the slide I showed you in opening with all of those different companies involved.  They all came together for decades to figure out how to do beamforming in mobile and eventually did years after, long after the patents in this

case.

So the patents are also not enabled.  So there is not infringement, there is -- and the patents are invalid because of enablement and because of written description.

Very briefly on the '794 Patent, this is a patent that seemed almost like an afterthought here.  It's the patent that General Access said is about hotspots, the patent actually doesn't use the word 'hotspots', but that's what General Access has said its patent is about, and there are three requirements, all added by General Access long after Raze had gone out of business, long after the patents had been rejected.  And I'm just going to focus on one because you saw an exchange with Mr. Rosenthal and Doctor Madisetti yesterday, and that related to this uplink/downlink.

The claims require monitoring a downlink signal.  That's the signal from the hotspot, if we call it that, to the phone.  You have to monitor the signals going that way.  And Doctor Madisetti only relied on evidence monitoring the uplink.  There was a long exchange with that, with Doctor Madisetti, and he finally conceded, yes, it's true in the Verizon products only the uplink is monitoring.

Well, that's not what the claim requires.  The claim requires monitoring the downlink, and that never happens in Verizon's product, ever.  There's no evidence.  They haven't even suggested with any evidence, testimony, documents,

nothing, that that ever happens.  So there is no infringement. They clearly have not shown infringement.

And the patent is invalid for written description for the same reasons.  These requirements that were added later are not in the patent.  Mr. Struhsaker tested truthfully -- testified--excuse me--truthfully that he did not put those elements in the patent.  He said, I did not write that, it's not -- no, it did not say that.  Do you see that?  So he admitted that he didn't put these in and they are not described anywhere in the patent at all, let alone in clear, concise, and exact terms.

And, of course, the patents are not enabled for the same reason that the '931 is not enabled--it doesn't say a single thing about how to do this in mobile.

So the bottom line, before I turn it over to my colleague, is Verizon does not infringe either of the patents, both of the patents are invalid, these are all separate and independent reasons that Verizon doesn't owe General Access anything.  I just -- as I move away from the podium and make room for my colleague, I do want to thank you-all for your time and your attention and, as I said, your care.  It means an awful lot to Verizon, and we appreciate it very much.

Thank you.

MR. DACUS:  How much time remains, Your Honor?

THE COURT:  Roughly about 15 minutes.

MR. DACUS:  Thank you, Your Honor.

Good morning.

THE COURT:  Would you like any additional warning?

MR. DACUS:  With three minutes, please, Your Honor.

THE COURT:  I'll warn you with three minutes.

MR. DACUS:  Thank you.

THE COURT:  Actually you have 14 minutes and 50 seconds.

MR. DACUS:  Thank you, Your Honor.  I'll speak fast if that's possible.

Good morning.  I'm going to start and talk with you about a topic that I have no desire to talk about, and that is the amount of money and the money that these folks seek from Verizon.  And I don't talk to you about it because Verizon owes them anything because we don't believe Verizon does.

But I want to talk to you about damages because in my experience, and it's certainly true in this case, the amount of money that folks ask for and the methods and the hoops that they jump through to get to big numbers is very telling.  And it's telling because it tells you what a case is really about, and it's telling because it helps you on this issue that the Judge has told you about many times, and that is credibility--judging each side and which is more believable.

How do damages tell us that?  You remember that General Access and Mr. Kennedy said, to use this cost-saving approach,

this approach that gets them up to this $847 million number. But what we know both from Mr. Kennedy --

May I have the document camera, please, Ms. Brunson.

What we know from Mr. Kennedy and from the instructions that the Court read to you is the way to calculate a royalty is actually through this thing called the market approach. And the market approach is not complicated.  The Judge just told you, I don't know if you heard him, but he said exactly what I said in trial:  It's just like going out and shopping for a house or shopping for a car, you just use comps.  You just see what's going on in the marketplace, and then you will know what's happening and how you're supposed to calculate the royalty.

You remember I asked Mr. Kennedy -- and this is the trial transcript of me questioning him.  In this hypothetical negotiation that the jury is conducting, they're supposed to be looking at real-world, real-world negotiations and transactions.  Is that something that they should be doing? And he said yes.  And he had to say yes because that's what the Court just told you you're supposed to do.  Right?

But then you remember I went through this with Mr. Kennedy and said, Hey, this is what's going on in the real world right here.

And at least in my opinion, truly remarkably, if you had the transcript, it's 15 minutes later and about 20 pages later

I said to him, after we went through this, So here we are again now talking about these real-world transactions that you told us we're supposed to look at, should we be looking at them?  And he said, Not in this case, don't look in the real world.

The Judge just told you that's exactly what you're supposed to be doing.  But there's a reason they don't want you to look at the real world.  Right?  There's -- there's a reason, and it's because of this:  We know that in the real world right at the time that these people were negotiating, by the way, from 2009 to 2016, remember that's when you're supposed to be conducting this hypothetical negotiation, they were in the real world offering to sell these very patents, these very patents.

And that's important or should be important to you because these are third parties who are valuing the patents.  It's not Verizon saying what they're worth.  It's not General Access.  These are experienced brokers that they went to.  These are -- this is the entire industry, very sophisticated technology companies.  And what was said?  The broker said, Look, we hope you can get 25 to $30 million.  That's what they put them out there for.

By the way, that -- that price, do you remember what Mr. Kennedy said about that price, his analysis of it?  He said that price that these very experienced brokers put out there

was discounted 98 to 99 percent because of the risk that these patents were either invalid or 5G did not infringe them.

I've never heard it, anything like that. I even asked Mr. Kennedy, In all your years of experience--and he had a lot--have you ever heard of someone discounting a patent 98 to 99 percent because of the risk of invalidity being that high, the risk of no one infringing being that high? Never. I mean, that's their expert saying, I've never seen that. That's a third-party broker saying that, not Verizon.

And what did the people in the marketplace say? No one made any offers. No one paid -- no one even offered for these patents.

On the issue of credibility, Mr. Hynek took the stand, I presume because there's no rational way to explain this request for $850 million versus the fact that no one in the world would even pay $15 million, and said, Oh, I was never trying to sell, I never even offered to sell.

And he said that in the face of the fact that he signed three separate brokerage agreements, his own signature on them. He said that in the face of his own expert admitting to me and saying to me, Yes, he was out there selling them. And he said that in the face of emails over multiple years. You saw them. Emails over multiple years, him talking with his broker about a selling price. They eventually got down to $15 million, $1 million per patent that they were trying to sell

because they were trying to sell 18 of them, including these two.

And did Mr. Hynek write back and say, Where are you getting this price from?  No.  You remember that email, he said, I get it, exclamation point, in response to trying to sell these things for a million dollars apiece.  That's what's going on in the real world.

In addition to that, there's something else going on in the real world at this time that's very important.  If you look at your jury instructions when you get back there, you'll see that the second factor the Judge told you to look at is, has someone in Verizon's position, have they licensed similar patents, have they paid a royalty for similar patents?

And you remember Verizon has.  We paid a company called IPComm who had 20 patents, very closely related.  I don't know if you remember, but Mr. Andrews actually walked you through to show you that the patents under that IPComm agreement are very, very closely related to the patents here, and we paid $8.4 million for 20 patents.  That's what should dictate how much these patents are worth, at most $8 million, but in truth probably a million dollars a patent, which no one actually ever even agreed to pay.

Instead, what General Access asked you to do is to look at this cost-savings method.  And that's the method that Doctor Kennedy and General Access dreamed up where they said,

Well, Verizon has a capacity problem.  And I--Mr. Kennedy--am going to assume that if they did not have this '931 Patent and this 32 percent gain, then they would have had to buy 32 percent more base stations.  You remember that?

And you remember, or at least I hope you remember, that I asked Mr. Kennedy about that very expressly, because he tried to waffle on it a couple of times.  But I said to him in the trial, The only calculation, sir, that you've done is based on the fact that Verizon has a capacity issue.

And he said, Yes, that's what I've done.

And I said, You haven't -- you haven't done any additional calculations; the only thing you have is this calculation based on this capacity issue.

And he said, Yes, that's all I have, I don't have a different calculation.

The problem with that, of course, is that you now know from Steven Rice, David Wolff, there is no capacity issue. This capacity issue, at least the one that Doctor -- Mr. Kennedy was talking about, had to have happened between 2019 and 2024.  All this stuff out here is irrelevant because the patent expired right here.

There is no capacity issue between 2019 and 2024, and you know why?  I'm not sure anyone's pointed this out.  We are talking only about the 5G network, the TDD 5G network.  The question is, is there a capacity constraint.  In this chart,

if you look up at the top right there, the only thing that relates to 5G is that little orange.  No wonder there wasn't a capacity constraint.  All this yellow that the Plaintiffs have been showing you the whole time, that's 2G, 3G, and 4G.  If I can zoom it in, I'll show you.  See?  All the yellow is 2G, 3G, and 4G.  There's no capacity constraint in 5G, just like Mr. Rice said.

To make matters worse, the entire calculation is based on this 32 percent number that Mr. Kennedy got from Doctor Madisetti.  You remember how Doctor Madisetti got that?  He took the Verizon network today and compared it to the 1972 ALOHA and said, Oh, there's a big gain.

Well, no kidding.  In half a century?  Wow!  You should have just hired me.  I could have told you that.  I don't really know what to say about that, other than it shows you what the lengths they will go to to try to inflate the amount of money that they want.  That's the bottom line.

What about this '794 Patent?  Do things get any better?  No.  Let me tell you why.  In a lawsuit where we've spent a week talking about beamforming, an entire week about these patents related to beamforming, what we ultimately find out is that for that '794 Patent, remember they just showed you it's 94 million products, 95 percent of those do not even have beamforming.  95 percent do not even have beamforming.  They want $264 million, and 95 percent of that doesn't even have

1312

beamforming in it.

To make matters worse, they say, well, we did a survey and we figured out that you can charge $32 more.

THE COURT:  Three minutes remaining.

MR. DACUS:  Thank you, Your Honor.

They never showed you the survey, didn't show you the questions, didn't show you the answers; just said, take our word for it for $264 million.

The Judge has said I'm short on time.  Here is where I want to end.  When you apply for a patent, you make a promise to the government.  The government says, We'll give you a patent for 20 years.  In return, you make two promises--you say that what I claim, I actually have and I actually possess and I can actually make.  That's enablement.  They broke that promise here.

In addition, you say, If I amend my original claims, then my amendment will only include what was in my original patent. That's the promise you make.  That's the promise they broke here.  That's written description.  You don't have to believe me--you can believe the inventor himself.  He told you that from the witness stand.

The third promise you make to the government is when they give you this deed, which is what a patent is, and they say you own, for example, 25 acres, you don't get to expand it to 30 or 40 or 50 acres.  And that's what's going on here.  These

1313

people are trying to take a patent that is two-and-a-half decades old and claim that they invented the most sophisticated and technologically advanced network the world has ever seen--5G; something that took thousands of engineers a full decade to put together, and they want to claim credit for it.  And they want $850 million.

This needs to stop.  This needs to stop.  We've had discussions in this case about trains.  This is a run-away train.  I can't stop it, Steven Rice can't stop it, none of the men and women who work at Verizon can stop it.  We have to ask you to stop it.  And that's what we do.  At the highest level, that's what we ask you to do with your verdict is stop this.

This is not what our constitutional patent system is about.  Our system is about the promotion of science, and what's going on in this courtroom is not about the promotion of science.

I'm going to end where I started and say thank you.  One thing I know Mr. Rice wants me to say to you is the thank you is unconditional.  Regardless of what your verdict is, we thank you.  This has been an imposition on your life.  The only thing these folks have ever asked for is an opportunity to present this to you, you've given them that opportunity, and we look forward to receiving your verdict.

Thank you, Your Honor.

THE COURT:  Plaintiff may now present its final closing argument.  You have 18 minutes, Ms. Fair.

MS. FAIR:  Thank you, Your Honor.

THE COURT:  Would you like a warning?

MS. FAIR:  Yes.  May I have a three-minute warning and may I adjust the flip chart, please?

THE COURT:  You may.

MS. FAIR:  Good morning.

We've worked this week to make your job easier.  We brought you the evidence, and we heard Mr. Krevitt just tell us that they tried to make things simple and straightforward.  I don't think that's what they did.  They've made your job harder.  They've made it harder with misdirection, the wrong legal standard, and half truths.

Now, I don't have time to respond to all of it and you heard you guys are the sole judges of credibility, you decide how much weight to give the evidence, and I think if we talk about just a few of these issues, you will see who's more credible.

In opening statement is where it all started on who you can trust in this case.  Do you remember the picture that they painted about Mr. Hynek and General Access and Mr. Struhsaker?  What they told you was that Mr. Hynek swooped in, grabbed these patents out of a company that was going bankrupt, hired some new lawyers, and went and prosecuted these patents.

The very first witness told us that's not what happened. Mr. Struhsaker took the stand and testified that, When I was a younger man, all I had was pieces of paper and an idea, and Mr. Hynek and his associates took a bet on me and supported me.

And then Mr. Hynek came in the next day, and he told us he wasn't just some guy who came in and bought some assets; he worked, with no exaggeration, with Mr. Struhsaker side by side 16 to 20 hours a day. He was on the ground trying to help develop a company that he believed in with impressive people and impressive ideas.

They knew this when they got up and told you that in opening statement. These two men were busting their tails trying to convince people where the industry was going--beamforming in TDD. No one would listen because it was too early for people to invest the capital that it would take to build out these networks. It would be another 15 years before they spent billions developing their network. Of course, Raze couldn't do that in 2001.

And when it didn't work out, they didn't just give up. Mr. Hynek continued the patent prosecution efforts--again, credibility--with the same firm that had been prosecuting the patents with Mr. Struhsaker.

You heard from one of those attorneys in a video deposition. He and others at his firm who were working on

these patents, they prosecuted thousands of patent applications.  They knew what they were doing.  It's the same way that Mr. Rice told us their patents are prosecuted.  You provide a disclosure of your invention to the Patent Office -- to the lawyers at Verizon, and then the lawyers do the work with the Patent Office, and one day a patent shows up, you get it years later.

Mr. Rice told us the truth.  That's how it works. There's nothing wrong with that, and there's a reason why the lawyers write the claims.  It's because the claims define the legal boundaries of the invention.

Doctor Andrews tried to tell you, well, that's not right. He has four patents and he was standing alone opposite Mr. Rice, Verizon's process, Mr. Struhsaker's attorneys, Mr. Struhsaker himself, and Doctor Madisetti, who I will remind you is the second most relied upon expert at the Patent Office.  They brought that out on cross examination.  He knows how to evaluate whether a patent is valid or not, and he told us these patents are valid.

What else did they point to to try and tell you there's something wrong here?  Not an analysis of the claims or the law.  They made a big deal about the timeline, how these patents came to be.

They relied upon Doctor Andrews whose livelihood is sponsored by Ericsson.  They just told us it's his whole

world, the telecom industry.  He said he's here to set the record straight on Mr. Struhsaker, Mr. Struhsaker, who took the stand and testified that he respects Doctor Andrews, he was willing to write a recommendation for Doctor Andrews' book, and in exchange Doctor Andrews takes the stand and says, let's tear these up for all time, let's invalidate, that is the end of the road for these patents.

And then we heard, oh, no, no, no, it's just a couple of the claims, the claims that Verizon infringes to the tune of hundreds of millions of dollars.

So they talk about this timeline, rejected claims, amended claims, adding claims, and what we hear in that, must be something wrong.  Well, finally today, finally their story is, oh, no, no, no, there's nothing wrong with that.  Then why are we still talking about it?  We know there is nothing wrong with it because Doctor Andrews did the exact same thing with his patents.  This is a normal part of the process, and they're spending their time trying to tell you that there's something wrong when there's not.

That is not credible.  All it means is that the Patent Office did its job, it had what it needed to make its determination.  These were not claims that just slipped on by the Patent Office.

Another issue I want to talk about is this broadcast beam signal.  Like I said, I can't talk about all of the issues on

the technology, but I think that this shows who you can trust. They say they don't infringe because this broadcast beam signal, it's not all the same information that goes to everyone, there's some information that's different.

Let's think about what they're saying.  What they are telling us, what they are trying to get us to believe is that Mr. Struhsaker, having just finished chairing the WiFi committee that came up with the first WiFi network, wants to start a company, wants to come up with ways to bring the internet to rural areas through wireless broadband, and that he spent the time and resources from his struggling company just fresh out of a garage pursuing applications in the Patent Office that say everyone gets the same information?

That makes no sense.  Of course this patent is not about everybody getting the same information.  The broadcast beam signal, the SSB, has some shared information and some information that's different.  Nobody disputes that. Everybody agrees about that.

And so what we know is that what Mr. Struhsaker invented, what Mr. Krevitt even just said is that would defeat the point of sectorization.  We agree.  Different information is included.  What Mr. Struhsaker invented was a timing architecture that synchronizes communication across multiple sectors.

I want to touch on one thing.  They have made a big deal

1319

about how Mr. Struhsaker admitted that he didn't invent beamforming in mobile, he didn't invent 5G, all these industry players have come together to develop 5G.

Nobody has made the claim that he invented 5G.  What he invented is the timing architecture, beamforming in a time division duplex system.  How do you synchronize the communications?  No one disputes how the system works.  They get up here and say show us the document, show us the document.  You remember the Court had to instruct them and remind them that testimony is evidence, too?

We have testimony about how the system works.  The only dispute is, does it meet the claim language.  And remember when Doctor Andrews took the stand, there was a moment where he had to admit he had never seen the Court's construction of a transceiver being one or more transceivers.  This is something that is required to be used in the analysis.  You saw how confused he looked when he saw it on the stand.  They didn't tell him about this.  His analysis was flawed from the start, and this is a critical point.

You heard Mr. Knobloch explain to you that what we're talking about is transceivers in the antennas are sending the signals.  Of course there's more than one transceiver sending the signal with the shared information.  It is a broadcast beam signal that goes to multiple sectors.

Fixed versus mobile.  I bet for the first three days of

this trial, you thought that this case was about fixed versus mobile in a wireless network. And I wouldn't blame you if you did. In fact, they're still talking about it which I was kind of surprised to hear because yesterday morning, it wasn't until Thursday morning on cross examination that Doctor Andrews finally came clean: It has nothing to do with infringement.

So why are they talking about this? Well, they make it sound like this patent can't be worth the paper it's written on because no one could build out the expansive network that Verizon has today. No one could build what Verizon has built today.

You remember they're so excited about this, that Mr. Struhsaker said you would be smoking crack to think that you could build out a cellular network like that? That's not the test. The test is not whether you could commercialize the invention. The Court's instructions tell us it's not about whether a commercially-viable product has been developed. That's not what our system expects of inventors. An inventor working out of his garage does not have to be able to build a commercial network like has been built over the last 15 years.

We know that somebody looking at this patent would know how to build it; they just don't have the capital. Doctor Madisetti showed us that the Patent Office had in its hands a reference explaining that you can have a mobile base station

system.  This wasn't a mystery.  Mr. Struhsaker just came up with a way to set the timing architecture in place for it.

One last thing I want to talk about is damages.  I think starting with the law tells us who you can believe.  The statute tells us it's a reasonable royalty for the use made of the invention, the patents in this case, by the infringer Verizon.  What is Verizon's use and how do we measure it for these inventions in this case.

We're the ones who brought you the evidence on that.  Mr. Kennedy, someone that you heard from Verizon's own counsel Ericsson hires and relies on for setting royalty rates when it's their patents, but apparently here he got it all wrong.

You just heard from Verizon's lawyers that, well, in the real world here is what we had, in the real world there were these brokers, in the real world there was this other agreement Verizon had.  But the instructions tell us that damages are based on a hypothetical negotiation, hypothetical because it didn't happen.  We assume that the patent is valid, we assume that it is infringed, and that is nothing that Verizon can bear to admit in the real world.

All the cards are on the table, there's no secrets, there's no sneaky tricks, and Mr. Kennedy did the hypothetical negotiation.  He looked at Verizon's use.  He showed us that without the '931, Verizon would lose 32 percent of its network, a third of it.  That's $1.7 billion, $1.7 billion in

infrastructure costs.

Now, I told you on Monday this was a big case, and we would be asking for a lot of money, and I told you I thought we had the evidence and I think that these numbers tell you this is not a small case, this is not a little bit of infringement.

What did they tell you?  You remember Mr. Faxer did a study, you remember this when he was on the stand, he told us, oh, well, the savings, it's not 32 percent, it's a whole lot less.  But then remember he had to admit that his simulation was done with settings that look nothing like the actual deployments of base stations in the United States.

Remember, he was talking about he did a study based on a 200-meter distance and the U.S. base stations are a thousand meters?  He finally had to admit, because we were persistent in deposition, that he had done another study that he didn't tell us about at 500 meters which was --

THE COURT:  You have three minutes remaining.

MS. FAIR:  Thank you, Your Honor.

-- are worse for Verizon.

Capacity I want to say one thing about.  This is another misdirection.  Nobody says their network is constrained.  Verizon has dozens, maybe hundreds of engineers and business people deciding this is how much capacity we need and they spend billions getting to what that capacity needs to be.

Sure, they've got a buffer in there.  Of course they do. But they want to tell you that they would give up a third of their network because that's how much excess they have.  I think you can trust what they say to their shareholders outside of this courtroom more than what they're trying to tell you inside of this courtroom, and that is, that if the deployment of 5G is delayed or hindered for any reason, we may experience a decline in the demand for our services.  And now they're trying to tell you they'd give you up a third of their network because they've got so much extra.

We are asking for $583 million because of the amount that they have saved from the '931 Patent.  On the '794 Patent they have sold almost a hundred million devices that use the hotspot.  And Verizon, again with misdirection, tells you, well, 95 percent of them don't have beamforming.  That's not the beamforming patent.  The '794 Patent is about hotspots.

I'm going to wrap up because I'm almost out of time.  I know that Mr. Hynek and Mr. Struhsaker want me to say thank you for your time.  It's been some long days, it's been a long week, and you guys have sat and paid attention and we appreciate that.

I was the first lawyer who got to talk to you on Monday, asking you questions, listening to your answers.  I'm the last lawyer you have to listen to this week, and it's going to end with you being asked three more questions.

Verizon does not listen to us.  They have to listen to you.  We await your verdict.

THE COURT:  Ladies and gentlemen of the jury, I'm going to ask you to retire to the jury room for just a couple of minutes.  And as soon as you are ready, please come back into the jury room because I have some final instructions to give you.  Simply leave your notebooks in your chairs, follow my instructions, and be back in the courtroom as soon as you can.

(Whereupon, the jury left the courtroom.)

THE COURT:  Be seated, please.

Counsel, during closing arguments I received a note from one of the jurors indicating they desperately needed a bathroom break.  That's why I've sent them out.  I will bring them back just as soon as I can and I will finish my final instructions to them.

In the meantime, just remain where you are, sit quietly.  We'll go off the record until the Court Security Officer indicates to me they're ready to come back in.

We are off the record.

(Pause in proceedings.)

THE COURT:  Mr. Barnett, if you'd bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Members of the jury, I'd like to provide you with a few final instructions before you begin your deliberations.

You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be.  Again, do not decide who should win the case and answer the questions to reach that result.  One more time I'll remind you that your verdict in this case must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true in patent cases between corporations, partnerships, or individuals.

A patent owner is entitled to protect his rights under the laws of the United States.  This includes bringing a suit in a United States District Court for monetary damages for infringement.  A defendant is equally entitled to defend itself under the laws of the United States, and this includes bringing any or all available defenses under the law in a

United States District Court in which it is being sued.

As a result, you should make no inference from the fact that this suit was filed or brought to trial.  The law recognizes no distinctions in the types of parties.  All corporations, partnerships, other organizations stand equal before the law regardless of their size and regardless of who owns them.

Now, as I told you, when you retire to the jury room to deliberate on your verdict, you're each going to have your own individual printed copy of these final jury instructions that I'm giving to you.

If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence over the course of the trial, then you should advise me by a written note signed and dated by your foreperson delivered to the Court Security Officer requesting one or more exhibits.  And in that case I will send those exhibits to you.

Once you retire, you should first select your foreperson and then conduct your deliberations.  If you recess during your deliberations, follow all the instructions the Court has given you about your conduct as jurors during the trial.

After you have reached your verdict, your foreperson is to fill in your unanimous answers to the questions in the verdict form, date it, sign it, and advise the Court Security Officer that the jury has reached a verdict.

Do not reveal your answers until such time as you are discharged, unless otherwise directed by me, and you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial are aids to your memory only.  If your memory should defer differ from your notes, then rely on your memory and not your notes.  The notes are not evidence, and a juror who has not taken notes must rely on his or her own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time during your deliberations, you should give a written message or a question signed and dated by your foreperson to the Court Security Officer, who will bring it to me.  I'll then respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  I will always first disclose to the attorneys for the parties your question and my intended response before I answer any question.

After you've reached a verdict and the Court has accepted it and I have discharged you as jurors, at that point, ladies and gentlemen, you are not required to speak with anyone about

your experience in this case.  On the other hand, at that point you will be completely free to discuss your experience in this case with anyone of your choosing, but that choice at that time will be yours individually 100 percent.

I'm now going to hand eight printed copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to consider your verdict.  We await your decisions.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are free to wait here in the courtroom or have one or more representatives here in the courtroom.  If you are off premises, I have what I believe are good cell phone numbers to contact you in the event we get a note or the return of a verdict.  Do not -- nonetheless, do not stray far so that if I call you, you can get back here promptly.

With that, awaiting either a question from the jury or a return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury--"We have reached a verdict."  And it is signed by Ms. Angelin Josey who was Juror No. 4 as foreperson.  It's

dated with today's date.  And I'll hand the original note to the Courtroom Deputy.

Does the Court need to hear from either party before I bring in the jury and receive the verdict?

MR. SUMMERS:  Nothing for the Plaintiff, Your Honor.

MR. KREVITT:  No, Your Honor.  Thank you.

THE COURT:  It goes without saying, no matter what the result is, I do not expect any outbursts or expressions one way or the other.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Ms. Josey, I understand you are the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Would you hand the verdict form to the Court Security Officer who will bring it to me.

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time, and I'd like to ask each of you to listen very carefully as I do that because after I have announced the verdict into the record, I'm going to poll the members of the jury to make sure and confirm that this is, in fact, the unanimous verdict of all eight members

1330

of the jury.

Turning to the verdict form and beginning on page 4 where Question 1 is found, "did Plaintiff General Access prove by a preponderance of the evidence that Verizon infringed any of the asserted claims of the following patents?"

For the '931 Patent the jury's answer is "Yes."

For the '794 Patent, the jury's answer is "Yes."

Turning to Question 2 on page 5 of the verdict form, "Did Verizon by clear and convincing evidence prove that the asserted claims of the asserted patents are invalid due to a lack of a written description or that they are not fully enabled?  For each patent answer 'yes' or 'no'."

For claims 28 and 29 of the '931 Patent, the jury's answer is "No."  For claims 1, 2, and 5 of the '794 Patent, the jury's answer is "No."

Turning to Question 3A, "What sum of money, if paid now in cash, as a reasonable royalty has General Access proven by a preponderance of the evidence would compensate General Access for its damages from Verizon's infringement of the '931 Patent?"

The jury's answer is "$583 million."

Question 3B, "What sum of money, if paid now in cash, as a reasonable royalty has General Access proven by a preponderance of the evidence would compensate General Access for Verizon's infringement of the '794 Patent?"

1331

The jury's answer is "$264 million."

Turning to page 8, the final page of the verdict form, I find it is dated with today's date and signed Ms. Josey as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure on the record that the verdict as I have read it is the unanimous verdict of all eight members of the jury. If this is your verdict as I have read it, would you please stand up? Thank you, ladies and gentlemen. Please have a seat.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury. I find that this is the unanimous verdict of all eight members of the jury. The Court accepts your verdict. And I will hand the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of this case. From the very beginning I have instructed you in various ways about your conduct during the trial and in various other matters. I am -- having accepted your verdict, I am discharging you as jurors and I am releasing you from all those instructions. You are no longer bound by any of the instructions that I have given you. That also means you're free to discuss your experience in this case as a juror with anybody of your choosing. You're also free not to discuss it with anybody. The decision as to whether or not to talk or

communicate with anybody about your experience in this trial is 100 percent yours individually and yours alone.

I do want to mention one thing to you.  I have been either on the bench or practicing law in this immediate area for 40 years.  For 40 years when a verdict is returned in this courthouse, the lawyers are instructed that they cannot approach the jurors and initiate a conversation with them about their jury service, but I can tell you that all the lawyers in this case are interested to know what your experience has been, whether they're on the winning side or the losing side.

Consequently, the way that's worked over the last 40 years, because I've been here to see it and I've been involved in it myself, there's one way out of this building and that's down those front steps.  Don't be surprised when you walk down those front steps to find a bunch of lawyers standing on the sidewalk hoping that you will stop and want to talk to them. If you do want to stop and talk to them, feel free to, and I promise you they will talk to you as long as you want to talk to them.  If you don't want to talk to them, don't feel like you're under any obligation whatsoever to stop and to visit with them; just walk straight on by.  It is completely up to you.  They will not interfere with your ability to do one or the other.  But you're going to have an easy opportunity to talk with them if you choose to stop and talk with them.

Now, because that's been a long-standing practice and custom in this division of this district, I've added a new step over the last several years. I've asked each side to give me a representative name and a phone number of somebody that participated in this trial on both sides, and I've put those names and cell phone numbers on pieces of paper. If you think you might want to talk to one of these lawyers or somebody from both sides at some point in the future but you don't want to do it today, I'll make sure you have one of these slips of paper and you can take it with you. And then in a week or a month, or whatever, if you want to pick up the phone and call them, they'll still want to take your phone call, but that way you won't feel compelled to stop and talk today or never have that opportunity. That's just a way to make it easier on you-all. But the decision is yours 100 percent either way. But I want you to know what to expect.

Also, ladies and gentlemen, I want to ask you to do me a personal favor. Now that the trial is over, I've accepted your verdict and I've discharged you as jurors, I'd like you -- when you get up in just a few minutes from those chairs, I'd like you to go back in the jury room and let me come in and I'd like to shake each one of your hands, I'd like to look each one of you in the eye and thank you personally for your service as jurors in this case because I believe the sacrifice you made to serve on this jury is significant public service

and it warrants that kind of a personal thank you from the Court.  I promise you, it's a Friday afternoon and Independence Day is next week, there are lots of things going on, and I am not going to keep you, but if you would give me just a minute before you leave the building to come in there and thank you personally, I would consider it a personal favor.

With that, ladies and gentlemen, that completes the trial of this case.  The Court accepts the jury's verdict, has discharged the jury.  Counsel, you are excused.

The Court stands in recess.

(The proceedings were concluded at 2:10 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                06/28/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER